IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LATANYA MOBLEY individually and on behalf of I.W.M.,<br><br>        Plaintiff,<br><br>   v.<br><br>LABORATORY CHARTER SCHOOL,<br><br>        Defendant. | CIVIL ACTION<br>NO. 24-2267 |

## OPINION

**Slomsky, J.**                                               **September 11, 2025**

**I.   INTRODUCTION** ................................................................................................ 3

**II.   BACKGROUND** .............................................................................................. 8

   A.   Evaluations, Individualized Education Plans ("IEPs"), and Due Process
      Hearing Before Independent Hearing Officer Charles W. Jelley, Esquire ........................ 8

   B.   Parent's Motion for Judgment on the Administrative Record .......................................... 14

   C.   Defendant Lab Charter's Motion for Judgment on the Administrative Record .............. 18

**III.   STANDARD OF REVIEW** ............................................................................ 20

**IV.   ANALYSIS** .................................................................................................... 21

   A.   Individuals With Disabilities Education Act ("IDEA") .................................................. 22

      1.   "Child Find" Obligation ................................................................................. 23

2.    Substantive Versus Procedural Violations ....................................... 24

3.    Parental Participation Is Paramount ............................................... 27

4.    Appropriate Relief ........................................................................ 27

B.    Independent Hearing Officer Charles W. Jelley's Final Decision and Order.................. 29

C.    Hearing Officer's Decision That I.W.M. Was Denied a FAPE
Is Supported by the Record and Will Be Affirmed ........................................... 34

1.    Hearing Officer Was Correct That I.W.F. Was Denied a FAPE ................................ 34

a.    Procedural Violations of the IDEA ......................................... 35

b.    Substantive Violations of the IDEA ........................................ 36

i.    Lab Charter's Evaluation and Draft IEPs Were Insufficient ................................ 36

ii.    Lab Charter Failed to Provide an FBA or a PBSP ................................ 37

iii.    I.W.M. Did Not Make Meaningful Progress ..................................... 38

c.    Lab Charter's Challenges to the Hearing Officer's Method
of Arriving at a Finding Is Unavailing........................................... 40

2.    This Case Shall Be Remanded to the Hearing Officer to Reconsider or Explain
Why the Hour-for-Hour Approach Is Not Appropriate as a Form of Relief ............... 41

3.    Hearing Officer's Order for Lab Charter to Fund IEEs Shall Be Enforced.................. 44

V.    CONCLUSION ................................................................................. 45

## I.    INTRODUCTION

Before the Court are Cross-Motions for Judgment on the Administrative Record, both of which challenge parts of a decision of a Pennsylvania Special Education Hearing Officer.  (Doc. Nos. 45, 56.)  In the 2022-2023 school year, Plaintiff I.W.M. ("I.W.M."), a minor, was enrolled in third grade at Defendant Laboratory Charter School of Communications and Languages ("Lab Charter"), when his mother, Plaintiff Latanya Mobley ("Parent"), informed Lab Charter that I.W.M., who has autism, an emotional disturbance and other health impairments, also has been diagnosed with Attention-deficit/Hyperactivity Disorder ("ADHD"), Post-Traumatic Stress Disorder ("PTSD"), Opposition Defiant Disorder ("ODD"), and impulse control disorder.  (Doc. No. 25 ("Amended Complaint") at ¶ 10.)  As a result, I.W.M. has been identified as a disabled child under the Individuals with Disabilities Education Act ("IDEA").[1]  (Id. at ¶ 11.)  I.W.M. was also enrolled at Lab Charter for the first half of fourth grade in the 2023-2024 school year.  (Doc. No. 56 at 23.)

The IDEA and its implementing regulations require local education agencies ("LEAs") that receive federal funding, such as Lab Charter, to provide children with disabilities with what is known as a free appropriate public education ("FAPE").[2]  A FAPE, as required by the Act, is tailored to the unique needs of the child by means of an "individualized educational program ['IEP']."[3]  "An appropriate IEP must contain statements about a disabled child's level of

---

[1]    I.W.M. is also "disabled" under the Americans with Disabilities Act ("ADA"), but as noted below, there are no longer any claims arising under that Act in this case.  (Doc. No. 27 at ¶ 11; Doc. No. 55 at 7 n. 14; Doc. No. 63 at 8 n. 15.)

[2]    C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 65 (3d Cir. 2010); see 20 U.S.C. §§1412(a)(1)(A), 1401(9).

[3]    C.H., 606 F.3d at 65; § 1414(d)(1)(A).

functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress."[4]

Here, Parent contends that Lab Charter's actions and omissions concerning I.W.M.'s evaluations and education plans deprived him of a FAPE during his enrollment in the 2022-2023 and 2023-2024 school years.  (Doc. No. 25 at ¶ 3.)

The two evaluations completed for I.W.M. were:

- by Lab Charter on December 8, 2022, and

- by an outside evaluator on June 20, 2023 ("IEE").

The two Individualized Education Plan ("IEPs") drafted for I.W.M. were:

- by Lab Charter in January 6, 2023, and

- by Lab Charter on October 3, 2023.

Believing that Lab Charter did not sufficiently fulfill its obligations to provide a FAPE, Parent filed, on September 7, 2023, a due process complaint, seeking compensatory education[5] and programmatic changes to I.W.M.'s IEP.[6]  (Id. at ¶ 80.)  In response, at an administrative due process hearing on the complaint, Lab Charter presented witnesses who testified that I.W.M. was promptly determined to be a student who required special services, which were thoroughly

---

[4]   C.H., 606 F.3d at 65; § 1414(d)(1)(A).

[5]   As discussed in more detail below, compensatory education is an equitable award that can be used for private tutoring and other services to help close the gap in a child's educational experience arising from denial of a FAPE.  (Doc. No. 25 at 4.)

[6]   The first due process complaint was filed before the second IEP was completed.  On November 14, 2023, Parent filed an amended due process complaint.  The original complaint and the amended due process complaints were filed by Araesia King, Esquire, who represented Parent at that time.

reviewed and adopted, demonstrating that I.W.M. was not denied a FAPE in either year of his enrollment.  (Doc. No. 26-4 at 2.)

On February 7, 2024, the due process hearing concluded before Special Education Hearing Officer Charles W. Jelley, Esquire.[7]  Parent argued that Lab Charter "failed to properly locate, evaluate, and educate the Student in the least restrictive environment."  (Doc. No. 26-3 at 2.) Parent sought compensatory education for past violations and an Order directing Lab Charter to make a prospective educational placement at its expense in another educational setting.  (Id.)  Lab Charter denied the charges, submitting that "its evaluation, and offer of FAPE were at all times appropriate."  (Id.)  On March 15, 2024, the Hearing Officer issued a decision in Parent's favor, in part, ordering Lab Charter to fund independent evaluations for I.W.M. but not awarding the requested relief of compensatory education and a prospective placement for I.W.M.  (Doc. No. 26-3 at 22–23.)  The part of the Hearing Officer's decision that Parent is challenging in this lawsuit is the denial of compensatory education; she is no longer seeking prospective placement for I.W.M., who now attends another school.  (Doc. No. 25 at ¶ 83; Doc. No. 53 at 10.)

On January 22, 2025, Parent filed an Amended Complaint[8] in this Court, not only appealing the denial of compensatory education but also asking this Court to enforce the Hearing Officer's directive that Lab Charter fund independent educational evaluations ("IEEs") and pay Parent's

---

[7]  The hearing was held virtually over Zoom on three days:  January 17, 2024, February 2, 2024 and February 7, 2024.

[8]  On May 29, 2024, Parent filed the original Complaint in this Court against Lab Charter.  (Doc. No. 1.)  On August 2, 2024, Lab Charter filed an Answer (Doc. No. 5) to the original Complaint.  On January 22, 2025, the Court granted Parent leave to file an Amended Complaint.  (Doc. No. 24.)

attorney's fees and costs.[9]  (Id. at ¶¶ 90–105.)  Parent seeks the following:  reversal of the Hearing Officer's Order denying compensatory education for the 2022-23 and 2023-24 school years pursuant to the IDEA (Count I);[10] enforcement of the Hearing Officer's Order directing Lab Charter to fund I.W.M.'s evaluations under 42 U.S.C. § 1983 and the IDEA (Count II); and attorney's fees and costs under the IDEA (Count III).  On February 5, 2025, Lab Charter filed an Answer with Affirmative Defenses and a Counterclaim against Parent.  In the counterclaim, Lab Charter contends that the evidence produced at the due process hearing "require[s] a finding that the Laboratory Chater School did not deny FAPE to I.W.M.," that the denial of compensatory education was proper, and that Parent's demands for Lab Charter to fund I.W.M.'s IEEs and to compensate Parent for attorney's fees and costs of litigation are unwarranted.  (Doc. No. 33 at 11, 23.)  On January 23, 2025, the Administrative Record from the Pennsylvania Department of Education, Office of Dispute Resolution, was filed under seal in this case.  (Doc. No. 26.)  The exhibits contained in the Administrative Record include an initial Evaluation Report (not the ones ordered by the Hearing Officer to be funded by Lab Charter), the transcript of the proceedings before the Hearing Officer, and the Hearing Officer's decision.  (See id.)

---

[9]  A decision on attorney's fees and costs will be decided at a later date in accordance with the Federal Rules of Civil Procedure and pertinent statutory requirements.

[10]  In the Amended Complaint, Counts I and III also list claims for violation of Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act ("ADA").  Section 504, which prohibits discrimination on the basis of disability in programs or activities that receive federal financial assistance from the U.S. Department of Education, also requires that students with disabilities receive FAPE.  See 29 U.S.C. § 794.  However, these claims were not raised in Parent's administrative complaint, and in her responses to Lab Charter's Motion for Judgment on the Administrative Record (Doc. Nos. 55, 63), Parent states: "Lab Charter includes arguments about Section 504 and ADA claims, but no Section 504 or ADA claims exist in this case."  (Doc. No. 55 at 7 n.14; Doc. No. 63 at 8 n.15.)  Thus, Counts I and III are construed as arising under the IDEA only, and not under § 504 or the ADA.

On May 12, 2025, the parties filed Cross-Motions for Judgment on the Administrative Record.[11]  (Doc. Nos. 45, 46.)  On June 13, 2025, Parent submitted her original opposition to Lab Charter's Motion for Judgment on the Administrative Record, including a response to Lab Charter's Statement of Undisputed Facts.  (Doc. No. 55.)  On June 17, 2025, Lab Charter filed a Memorandum in Response to Parent's Motion for Judgment on the Administrative Record.[12] (Doc. No. 57.)  On August 6, 2025, a hearing was held on the Cross-Motions for Judgment on the Administrative Record (Doc. Nos. 45, 56), which are now ripe for review.

For reasons stated infra, Defendant Lab Charter's Motion for Judgment on the Administrative Record (Doc. No. 56) will be denied, and Plaintiff Parent's Motion for Judgment on the Administrative Record (Doc. No. 45) will be granted in part.  This case will be remanded to the Hearing Officer to either reconsider his conclusion in rejecting the "hour-for-hour" approach or to explain in more detail why the facts show this form of compensatory education relief is not appropriate.  In addition, Lab Charter shall pay for new IEEs.

---

[11] Defendant labeled its original motion a "Motion for Summary Judgment" (Doc. No. 46), but on May 22, 2025, following a telephone conference held on that day with counsel for the parties, the Court said that the Motion would be construed as a Motion for Judgment on the Administrative Record.  (Doc. No. 52.)

[12] On May 30, 2025, Parent supplemented her Motion with a Statement of Undisputed Facts. (Doc. No. 53.)  Lab Charter subsequently filed three "corrected" Motions for Judgment on the Administrative Record.  (Doc. Nos. 47, 50, 56.)  On July 16, 2025 the Court granted Parent leave to respond to Defendant's third corrected motion (Doc. No. 62), and Plaintiff did so on July 28, 2025.  (Doc. No. 63.)

## II.    BACKGROUND

### A.    Evaluations, Individualized Education Plans ("IEPs"), and Due Process Hearing Before Independent Hearing Officer Charles W. Jelley, Esquire

On August 29, 2022, I.W.M.—a foster care child who was adopted at age 6 after experiencing physical abuse from his foster siblings—started the third grade at Lab Charter. (Doc. No. 56 at 23; Doc. No. 50-4 at 52.)  He began fighting and eloping.[13]  (Doc. No. 53 at 1.)  After Parent informed Lab Charter of I.W.M.'s diagnosis, Lab Charter did not identify him as a child with a disability or qualify him for special education services, but did meet with Parent and other school staff on I.W.M.'s first day to establish an individual safety plan for the student to address his eloping and not responding to redirection. (Doc. No. 53 at 2; Doc. No. 56 at 24.)  On September 29, 2022, a family intervention meeting was held to discuss I.W.M.'s ongoing behavioral challenges, where the following was discussed:  fighting/aggression toward peers in and out of the classroom, destroying school property, and walking out of class (eloping). (Doc. No. 26-3 at 4.)  Thereafter, Lab Charter initiated an evaluation process of I.W.M. in October 2022.  (Doc. No. 53 at 2.)  "Teacher input" was received on October 14, 2023, and "testing observations" were undertaken in November and early December, including classroom observation. (Doc. No. 56 at 24; Doc. No. 50-4 at 53; Doc. No. 33 at 13.)

On December 8, 2022, Lab Charter issued the only evaluation report they completed for I.W.M. (Id.) The report lacked certain information because attempts to obtain the student's current cognitive and achievement scores failed since I.W.M. refused to remain seated and answer enough

---

[13]  Eloping, commonly associated with autism, means leaving a supervised area, typically to gain access to preferred items or activities, to escape non-preferred activities, or for sensory stimulation.  (Doc. No. 45-1 at 7 n. 3 (citing Phillips, et al., <u>Assessing and Treating Elopement in a School Setting, Teaching Exceptional Children</u> (July 2018)).

questions. (Doc. No. 50-4 at 54, 56.) However, using a Behavior Assessment System for Children known as "'BASC-3,' which was designed to facilitate the differential diagnosis and classification of a variety of emotional and behavioral disorders . . . and to aid in the design of treatment plans," Parent and I.W.M.'s teacher were able to rate the student in various categories. (Id. at 56–60.) Using only the student's resulting scores, Lab Charter concluded that I.W.M.'s primary disability category was "emotional disturbance," and his secondary disability category was "other health impairment."[14] (See id.) The evaluation did not identify I.W.M.'s other known disabilities, such as autism, Post-Traumatic Stress Disorder ("PTSD"), Oppositional Defiant Disorder ("ODD"), or impulse control disorder. (Id. at 60.)

Within two (2) months of I.W.M.'s enrollment at Lab Charter, a Special Educational Coordinator started doing "almost daily" check-ins with I.W.M., which were suggested by the IEP drafted on October 3, 2023. (Doc. No. 56 at 25; Doc. No. 50-3 at 72.) Throughout the school year, school staff kept a checklist of I.W.M.'s behavioral incidents in an effort to support the student. (Id. at 75.) In January 2023, Lab Charter held a meeting to discuss the evaluation, and a new draft IEP was created but was never sent to Parent. (Doc. 50-7 at 54–79; Doc. 53 at 3 n 4.)

---

[14] 34 CFR § 300.8(b)(9) provides:

Other health impairment means having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that—

(i) Is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette syndrome; and

(ii) Adversely affects a child's educational performance.

34 CFR § 300.8(b)(9).

The parties disagree about whether Parent received a Notice of Recommended Educational Placement ("NOREP"), which is required to be sent to parents any time a school either proposes to or refuses to make a change to an IEP: Lab Charter contends that a NOREP was signed and sent on February 10, 2023 to Parent's then-attorney, who signed it and returned it to the school; Parent alleges that this procedural safeguard required by the IDEA was never given to her.[15]  (Doc. No. 56 at 25–26; Doc. No. 53 at 3–4); 34 CFR § 300.503.[16]

At Parent's request, Lab Charter funded an Independent Educational Evaluation (IEE), which concluded that I.W.M. has a primary disability of autism, a secondary disability of emotional disturbance, and a tertiary disability of Other Health Impairment ("OHI"), and noted his diagnosis of Attention-deficit/Hyperactivity Disorder ("ADHD"), Post-Traumatic Stress Disorder ("PTSD"), Oppositional Defiant Disorder ("ODD"), and impulsive control disorder.  (Doc. No. 50-4 at 44–45.)  The IEE recommended that the student receive a supplemental level of autistic, emotional, and learning support.  (Id. at 45.)

Moving forward, Lab Charter held a meeting on September 7, 2023 with Parent and school staff to discuss the IEE and a second draft of I.W.M.'s IEP.  (Doc. No. 25 at ¶ 64.)  At the meeting, Lab Charter administrators agreed that I.W.M.'s IEP should include a Functional Behavioral

---

[15]  See 34 C.F.R. § 300.504(a)(1); 34 C.F.R. § 300.503(a).

[16]  34 C.F.R. § 300.503(a) provides in part: (a) Notice. Written notice that meets the requirements of paragraph (b) of this section must be given to the parents of a child with a disability a reasonable time before the public agency—

(1) Proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; or

(2) Refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child.

34 C.F.R. § 300.503(a).

Assessment ("FBA")[17] and a positive behavior support plan ("PBSP").[18]  (Doc. No. 50-3 at 45.)

The contents of the IEE were not discussed at the meeting, but Lab Charter indicated that they had

questions for the person who issued it and were waiting to hear back from her.  (Doc. No. 45-1 at

11; Doc. No. 56 at 27.)  Lab Charter completed another draft IEP for I.W.M. on October 3, 2023,

which Parent received on November 9, 2023.  (Doc. No. 56 at 27; Doc. No. 53 at 8).[19]  Parent

---

[17]  A Functional Behavioral Assessment ("FBA") is defined as:

> a process for identifying problem behaviors and developing interventions to
> improve or eliminate those behaviors . . . consist[ing] of information-gathering
> procedures that result in a hypothesis about the function(s) that the behavior is
> serving for the student. The process also results in the identification of
> environmental antecedents (what happened before the behavior occurred) and
> consequences (what happened after the behavior occurred) that are maintaining the
> behavior . . .

Pennsylvania Training and Technical Assistance Network ("PaTTAN"), Functional
Behavioral Assessment Process, www.pattan.net/getmedia/eca12015-858b-4448-962d-
753816d71e20/FBA_ProcessBklt0516 (last visited August 12, 2025).

[18]  The information gathered for an FBA is used to develop a positive behavior support plan
(PBSP), which is defined as a plan that:

> outlines strategies and supports to help the student learn and adopt new, more
> appropriate behaviors that serve the same function as the challenging behavior.
> PBSPs may include changes to the environment, teaching new skills, and
> reinforcing positive behaviors. The goal is to replace disruptive behaviors with
> constructive ones, thereby enhancing the student's ability to succeed academically
> and socially.

PaTTAN, Functional Behavioral Assessments and Positive Behavior Plans,
www.pattan.net/Evidence-Based-Practices/Learning-Environment-Engagement/
Functional-Behavior-Assessments-FBAs-and-Positive (last visited August 12, 2025).

[19]  The parties disagree about the timing of the second draft of I.W.M.'s IEP:  Lab Charter claims
it was "distributed to all [IEP] team members [including Parent] on or about October 3, 2023,
on the same day that the school's Special Education Director was rushed to the hospital for
emergency surgery; Parent contends this second draft was not sent to her until November 9,
2023.  (Doc. No. 56 at 27; Doc. No. 47-11 at 76; Doc. No. 53 at 8.)

avers that the second draft IEP (October 2023) is "almost identical" to the first draft IEP (January

2023), and therefore deficient, while Lab Charter notes that five (5) new goals were set for I.W.M.,

complete with baseline information by which to judge the student's progress.  (Doc. No. 53 at 8;

Doc. No. 56 at 27.)  The new goals in the second draft IEP are the following:

> Written Expression: By the end of the IEP term, when given a topic/writing prompt,
> [I.W.M.] will write a 5-sentences paragraph with information and ideas organized
> including a topic sentence, detail sentences and a concluding sentence in correct
> sequence with 80% accuracy in four of five trials.
>
> Baseline: [I.W.M.] can write a simple sentence with a word box, and adult prompts
> to edit errors of capitalization, spelling and organization.
>
>
> Listening Comprehension: After listening to a grade level selection [I.W.M.] will
> retell, paraphrase, and explain the key ideas of the selection with 80% accuracy in
> 4/5 trials.
>
> Baseline: After listening to a mid-3rd grade level selection, [I.W.M.] scored 40% on
> the retelling rubric.
>
>
> Math – Real World Problems: By the end of the IEP term, given one and two steps
> word problems [I.W.M.] will identify the information needed, identify the correct
> operation (+, -, x, /), set up the math problem and solve the problem correctly with
> 80% accuracy in 4 out of 5 opportunities.
>
> Baseline: 40%
>
> Represent and solve problems (addition and subtraction): By the end of the IEP
> term, given problems orally or on paper, [I.W.M.] will use addition and subtraction
> within 1,000 to solve one- and two-step word problems involving situations of
> adding to, taking from, putting together, taking apart, and comparing, with
> unknowns in all positions, e.g., by using drawings and equations with a symbol for
> the unknown number to represent the problem with 70% accuracy in 4 out of 5
> trials.
>
> Baseline: Work samples and Teacher probes from [I.W.M.'s] current 4th grade year
> indicate that he correctly solves one and two digit addition and subtraction word
> problems with 40% accuracy.
>
>
> Basic Math Operation Facts: Given 20 items, [I.W.M.] will be able to complete
> addition, subtraction, multiplication, and division basic facts (0-10), using a variety

of strategies (skip counting, arrays, etc.) with 80% accuracy in 4/5 consecutive trials across the IEP term.

Baseline: 20%

(Doc. No. 50-7 at 41–46.)  The new draft IEP does not add baseline data to the goals from the first IEP, does not amend the behavior goal set in the original IEP, and does not address I.W.M.'s eloping and fighting.  The behavior goal remains the same in both draft IEPs:

Behavior: By the end of the IEP term, when given an assigned task, [I.W.M.] will independently complete an assignment/task, and ask for assistance, if needed, with 80% accuracy in 5 out of 5 consecutive trials, in a small group setting, as measured by teacher-chartered observations.

(Doc. No. 50-7 at 40.)  While the parties agree that I.W.M.'s elopements, which lasted anywhere from 15 minutes to several hours, increased during his enrollment, Lab Charter contends that "his academics [were] not directly affected."  (Doc. No. 53 at 11; Doc. No. 56 at 28.)  The following statements were made at the Hearing before Hearing Officer Jelley:

Q:  With regard to those elopements, have you noted any diminution in his grades, his academics, because he from time to time has behavioral problems?

A:  Not a direct, you know, impact on his academics, meaning them going down. During the last school year, we have documented that [I.W.M.] did experience elopement from class, and elopement continued this year. Nonetheless, he is able, when [the teacher] noted that we do direct instruction with him so that we're able to provide any missing instruction that he might need so that his academics is not directly affected.

(Doc. No. 50-3 at 84.)  Lab Charter also contends that it had a "safety plan" in place for I.W.M. during his entire enrollment to deal with his increased behavioral problems.  (Doc. No. 56 at 29.)

Acknowledging the student's autism, the second draft IEP suggested supplemental support, and Lab Charter appointed a new autism teacher, but an appropriate program was not finalized in time to help I.W.M.  (Doc. No. 53 at 9; Doc. No. 56 at 29.)

In February 2024, the following incident occurred, as detailed by a member of Lab Charter's staff at the Hearing:

Q.  Do you recall any instances in your time serving as [I.W.M.'s] one-on-one that you have had to physically restrain him?

A.  The one incident the other—that day when he was biting at me and kicking at me and all of that stuff.

Q.  What did the restraints involve, if you can explain for us?

A.  We were in the safety/calm room and  . . . we were trying to get [I.W.M.] to calm down because he was kind of at a really—at a high at that time and was screaming obscenities, I mean, cursing up a storm, kicking, just all kind of stuff. And then when he got up  . . . [another staffer] grabbed his legs and I had his arms.

\*\*\*

Q.  And then when you and [another staffer] had to hold him down momentarily, do you remember if he was facing up or kind of facing down toward the ground when you were doing that?

A.  He was facing down.

(Doc. No. 50-3 at 157–58.)

Parent pulled I.W.M. out of Lab Charter in the spring of 2024, enrolling him in the School District of Philadelphia, which he had attended previously.  (Doc. No. 53 at 10.)  Before he left Lab Charter, he scored below the basic level in math and basic in English language arts and science on the Pennsylvania System of School Assessment tests ("PSSAs").  (Doc. No. 53 at 10.)  And after leaving Lab Charter, testing done by the School District of Philadelphia showed that I.W.M. needed "strategic intervention" in math and was "on watch" in reading.  (Id. at 11.)

**B.    Parent's Motion for Judgment on the Administrative Record**

In her Motion for Judgment on the Administrative Record, Parent asks this Court to correct any erroneous factual findings made by the Hearing Officer Jelley and to:  (1) affirm the Hearing Officer's finding that Lab Charter denied I.W.M. a FAPE for the 2022-2023 and 2023-2024 school years; (2) affirm the Hearing Officer's award of the Independent Educational Evaluations ("IEEs") and order Lab Charter to immediately fund them; (3) reverse the Hearing Officer's order denying

14

compensatory education and order compensatory education for each day that school was in session during the 2022-2023 and 2023-2024 school years; and (4) award Parent her reasonable attorney's fees and costs. (Doc. No. 45-1 at 4; Doc. No. 27 at ¶¶ 101-105.)

First, Parent submits that Lab Charter failed to timely respond to her requests in September and October 2022 to evaluate I.W.M. for an IEP, taking longer than the ten (10) days required by 22 PA. CODE § 711.24(c).[20] (Doc. No. 45-1 at 8.) And when the school issued an evaluation report in December 2022, Parent disagreed with it, finding it "incomplete and inaccurate" because it "had no IQ assessment or achievement testing" and did not thoroughly address all of I.W.M.'s known disabilities that "impacted his education." (Id. at 9.) The draft IEP was never provided to Parent, and Lab Charter implemented it without Parent's consent. (Id. at 9–10.) Parent alleges that Lab Charter failed to provide Parent with a NOREP, the prior written notice required by the IDEA. (Id.); 34 C.F.R. § 300.503(a).

Second, Parent highlights the following deficiencies of Lab Charter, noted by the Hearing Officer, which deprived I.W.M. of a FAPE, including:

- Lab Charter's IEP goals for I.W.M. were vague, overbroad, and not individualized. They did not even include baseline testing or data, making progress monitoring for I.W.M. impossible.[21]

---

[20]  22 PA. CODE § 711.24(c) provides:

> Parents may request an evaluation at any time, and the request must be in writing. The charter school or cyber charter school shall make the permission to evaluate form readily available for that purpose. If a request is made orally to any professional employee or administrator of the charter school or cyber charter school, that individual shall provide a copy of the permission to evaluate form to the parents within 10 calendar days of the oral request.

22 PA. CODE § 711.24(c).

[21]  (Doc. No. 26-3 at 5 ¶ 10.)

- Lab Charter neglected to conduct a functional behavioral assessment (FBA) for or provide I.W.M. a positive behavior support plan (PBSP), even though the law and I.W.M's IEP required them.[22]  Lab Charter also did not include any behavioral goals in I.W.M.'s IEP to address his ongoing fighting and elopement.[23]

- I.W.M.'s IEP failed to provide individualized or tailored special education interventions—also known as "specially designed instruction" (SDI) to meet I.W.M's unique needs.[24]  Lab Charter's SDIs did not even target or address I.W.M.'s emotional disturbance disability.[25]

- Lab Charter neglected to include any classroom-based or curriculum-based data in I.W.M.'s IEP, including any information related to I.W.M.'s behavioral problems.[26]

- I.W.M.'s IEP failed to address any of his ADHD-related deficits, which impacted his learning.[27]

- I.W.M.'s IEP provided itinerant learning support (45 minutes per day) even though I.W.M.'s IEP team concluded that he required emotional support due to his emotional disturbance.[28]

(Doc. No. 45-1 at 10–11.)

Third, Parent contends that Lab Charter never addressed the bullying that I.W.M. was experiencing during his first year at the school and how that bullying would affect his experience given his fighting and eloping.  (Doc. No. 45-1 at 10–11.)  This failure allegedly continued

---

[22]  (Doc. No. 26-3 at 4–5 ¶ 8.)

[23]  (Doc. No. 26-3 at 5 ¶ 10.)

[24]  (Doc. No. 26-3 at 5 ¶ 11.)

[25]  (Doc. No. 26-3 at 5 ¶ 8.)

[26]  (Doc. No. 26-3 at 5 ¶¶ 9–10.)

[27]  (Doc. No. 26-3 at 5 ¶ 8.)

[28]  (Doc. No. 26-3 at 5 ¶¶ 12–13.)

16

throughout I.W.M.'s second year at the school, putting the student's safety in jeopardy.  (Id. at 13.)  For example, in February 2024, Lab Charter restrained I.W.M. in a face-down position after he hit another staff member.  (Id. (citing 22 Pa. Code § 711.46 ("The use of restraints is considered a measure of last resort, only to be used after other less restrictive measures.")))  A less restrictive measure would have been for Lab Charter to provide I.W.M. with a behavior plan (FBA and PBSP).  (Id.)

Fourth, after Lab Charter funded an IEE, and the report recommended that I.W.M. get supplemental autistic, emotional, and learning support, the school failed to review and consider it in terms of I.W.M.'s programming at a meeting with Parent on September 7, 2023.  (Id. at 11.)

Fifth, Lab Charter's second "draft" IEP was almost identical to the first draft, which the Hearing Officer had found to be deficient, again ignoring I.W.M.'s more serious behaviors such as fighting and eloping.  (Id. at 12.)  The second draft IEP also omitted the functional behavioral assessment (FBA) and a positive behavior support plan (PBSP) required by I.W.M.'s IEP.  (Id.)  Parent further alleges that Lab Charter again failed to provide Parent with the prior written notice required by the IDEA.  (Id. (citing 34 C.F.R. § 300.504(a)(1); 34 C.F.R. § 300.503(a)).)  In sum, Lab Charter "never conducted an FBA or PBSP despite the legion of negative behaviors that I.W.M. had exhibited through the school years."  (Id. at 13.)

Finally, Parent claims that a result of Lab Charter's failure to track his progress due to a lack of baseline data, I.W.M. did not make any meaningful progress during the two (2) school years he was enrolled there.  (Id. at 21, 25.)  For example, his third-grade teacher testified that I.W.M. made de minimus progress on his reading, writing, and math goals, and that his functional writing fell two to three grade levels below his peers, and he was behind his peers in math.  (Id.)

### C.    Defendant Lab Charter's Motion for Judgment on the Administrative Record

In its Motion for Judgment on the Administrative Record, Lab Charter seeks the following: (1) reversal of the Hearing Officer's finding that Lab Charter denied I.W.M. a FAPE for the 2022-2023 and 2023-2024 school years; (2) affirmation of the Hearing Officer's decision not to award compensatory education; and (3) reversal of the Hearing Officer's order requiring Lab Charter to fund I.W.M.'s IEEs. Lab Charter also opposes Parent's request for Lab Charter to pay Parent's attorney's fees and costs.

First, Lab Charter contends that I.W.M. was evaluated with a series of cognitive assessments after Parent reported behavioral and emotional challenges. (Doc. No. 56 at 2.) This led to Lab Charter developing an IEP for both of I.W.M.'s school years, in collaboration with Parent, I.W.M.'s teachers, the school's Special Education Coordinator, the principal, and the school psychologist. (Id. at 2–3.) At the due process hearing, Lab Charter presented witnesses, including the school's principal, who testified that I.W.M. "was properly and adequately determined to be a student who required special services that were then (and continued to be) thoroughly reviewed and put into place throughout his schooling." (Doc. No. 33 at 11.) Thus, from Lab Charter's point of view, the Hearing Officer erred in determining that Lab Charter denied I.W.M. a FAPE during the 2022-2023 and 2023-2024 school years. (Doc. No. 56 at 2.)

Second, Lab Charter submits that the IEPs were a success because I.W.M. made consistent academic progress during both his third- and fourth-grade years, as evidenced by his strong report card grades. (Id. at 3.) For example, during the first half of the third grade, his marks were: English Language Arts (81); Math (83); Science (87); Social Studies (79); Physical Education (77). (Id.) At the end of the third grade, his marks were: English Language Arts (80); Math (80); Science (87); Social Studies (88). (Id.) And in the fourth grade, his marks were: English

Language Arts (90); Math (85); Music (80); Social Studies (90); Physical Education (100). (<u>Id.</u> at

3–4.) The first IEP, according to Lab Charter, "set goals for teachers to recognize the Student's

stress and function levels, and to aid him with those behavioral issues as needed . . . and called for

Student to spend most of his time in a regular classroom setting [that being the] least restrictive

environment." (<u>Id.</u> at 3.) Lab Charter also contends that according to I.W.M.'s IEE, "significant

progress [was] made with staying in his seat, staying in the room and completing his work." (<u>Id.</u>

at 33.)

Third, Lab Charter asserts that the Hearing Officer improperly acted as a substitute expert

and made unsupported findings of IDEA violations. (<u>Id.</u>) Defendant argues that the allegations

of substantive violations of the IDEA were not supported by testimony, expert or otherwise, and

that any procedural deficiencies alleged (<u>e.g.,</u> timing or completeness of evaluations) did not result

in substantive harm or denial of educational benefit. (<u>Id.</u> at 4.) Lab Charter characterizes the

Hearing Officer's findings as undeserving of deference. (<u>Id.</u> at 40.) Lab Charter lists a dozen

examples of the Hearing Officers "improper attributions and unsupported citations," rendering his

ruling contrary to the record. (<u>Id.</u> at 40–42.) For example, Lab Charter asserts:

> On the very first substantive page of the Hearing Officers stated findings (page 3),
> all of which was made in broad paragraph form, the Hearing Officer cites to pages
> from the record to bolster a finding that the Parent asserted a need for social skill
> instruction[.] However, no page citations were made to the multipage exhibits noted
> and the reference pages 170-175 only reference testimony related to later times in
> the school year and not to the inception of the Students matriculation as referenced
> by the Hearing Officer in his conclusions.

(<u>Id.</u> at 40.)

Fourth, Lab Charter submits that Parent did not meet her burden of proof to show that the

student suffered educational harm justifying compensatory education. (<u>Id.</u> at 21.) Lab Charter's

position is that "no denials of [a] FAPE resulted from either procedural or substantive omissions

or neglect of responsibility to the student," but even if there were procedural violations of the IDEA, no educational deprivation occurred, and thus no equitable relief is appropriate. (See id. at 10, 21.) According to Lab Charter, compensatory education must be tied to actual loss, not automatically awarded for every procedural misstep. (See id.)

Fifth, Lab Charter contends that because Parent did not include a claim to enforce the Hearing Officer's award of funding for I.W.M.'s independent educational evaluations (IEEs) in her original complaint, the claim should not be considered. (Id. at 7.) Lab Charter further avers that "Parent was not a prevailing party and not entitled to attorney fees." (Id.)

## III.    STANDARD OF REVIEW

Because parents and educators sometimes disagree about what a child's Individualized Education Plan, or IEP, should contain, the IDEA has established procedures to resolve disputes. See Endrew F. v. Douglas Cnty. Sch. Dist. RE-1, 580 U.S. 386, 391–92 (2017). "There are congressionally mandated administrative procedural safeguards to resolve disagreements between parents and school districts over the proper IEP for a child or other FAPE-related disputes." Q.T. on behalf of H.P.-B. v. Pottsgrove Sch. Dist., 70 F.4th 663, 664–65 (3d Cir. 2023) (citing Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 368–69, (1985).) The parties may resolve their differences informally, through a "[p]reliminary hearing," or, more formally, through mediation. 20 U.S.C. §§ 1415(e), (f)(1)(B)(i). Additionally, the parties may proceed to a "due process hearing" before a state or local educational agency. Id. §§ 1415(f)(1)(A), (g).

At the conclusion of the state due process hearing, the IDEA permits the losing party to appeal the decision to state or federal court. Id. § 1415(i)(2)(A). The district court reviews the record of the administrative proceeding, hearing additional relevant evidence at the request of a party, and, based on a preponderance of the evidence, grants appropriate relief. § 1415(i)(2)(C);

<u>Susan N. v. Wilson Sch. Dist.</u>, 70 F.3d 751, 760 (3d Cir. 1995).  The district court gives "due weight" to the hearing officer's decision.  <u>Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley</u>, 458 U.S. 176, 205–06 (1982).

Affording "due weight" to the hearing officer's decision requires a district court to conduct a "modified de novo review" of the administrative proceedings.  <u>Q.T.</u>, 70 F.4th at 666 (citing <u>P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.</u>, 585 F.3d 727, 734 (3d Cir. 2009)).  The United States Supreme Court has construed 20 U.S.C. § 1415(i)(2)(C) to require that district courts be careful to avoid replacing their "own notions of sound educational policy for those of the school authorities [that] they review."  <u>Rowley</u>, 458 U.S. at 206.  As such, "'[f]actual findings from the administrative proceedings are to be considered prima facie correct,' and if the reviewing court does not adhere to those findings, it is 'obliged to explain why.'"  <u>Q.T.</u>, 70 F.4th at 666 (quoting <u>P.P.</u>, 585 F.3d at 734) (citation omitted).  "Taking the [hearing officer's] factual findings as prima facie correct, [a court] must decide whether the record contradicts those factual findings."  <u>S.H. v. State-Operated Sch. Dist.</u>, 336 F.3d 260, 271 (3d Cir. 2003).  But the legal determinations of the hearing officer are subject to plenary review by the district court.  <u>See</u> <u>A.C. v. Owen J. Roberts Sch. Dist.</u>, 554 F. Supp. 3d 620, 624 (E.D. Pa. 2021) (citing <u>S.H.</u>, 336 F.3d at 271).  Notably, "[a]ny legal determinations by the administrative decisionmaker are reviewed <u>de novo</u>."  <u>M.D. v. Colonial Sch. Dist.</u>, 539 F. Supp. 3d 380, 388 (E.D. Pa. 2021).

## IV.    ANALYSIS

As noted earlier, Parent contends that the Hearing Officer:  (1) was correct in finding that Lab Charter denied I.W.M. a FAPE, (2) erred by denying compensatory education to I.W.F, and (3) was justified in ordering Lab Charter to fund further evaluations.

On the other hand, Lab Charter submits that the Hearing Officer:  (1) erred in finding that I.W.M. was denied a FAPE, (2) was correct in denying compensatory education, and (3) was not justified in ordering Lab Charter to fund further evaluations.

For the reasons that follow, the Court finds that: (1) the Hearing Officer was correct in finding that Lab Charter denied I.W.M. a FAPE, (2) was justified in ordering Lab Charter to fund further evaluations, but (3) failed to fully consider all of the facts as applied to the law concerning whether "hour-for-hour" compensatory education is warranted.  But before addressing the merits of the parties' arguments, a discussion of the IDEA is warranted.

### A.    Individuals With Disabilities Education Act ("IDEA")

Through the Individuals with Disabilities Education Act ("IDEA"), the federal government provides states with federal funds to assist in educating children with disabilities.  20 U.S.C. § 1400, et seq.  This funding is conditioned upon compliance with certain statutory requirements, including the requirement that states provide a free appropriate public education, or a FAPE, to each eligible child.  Endrew F., 580 U.S. at 390 (citing 20 U.S.C. § 1412(a)(1)).  Under the IDEA, a FAPE includes "special education" and "related services."  20 U.S.C. § 1401(9).  A "special education" is "specially designed instruction . . . to meet the unique needs of a child with a disability."  Id. § 1401(26).  "Related services" are the support services "required to assist a child . . . to benefit from" that instruction.  Id. § 1401(29).  In exchange for receiving federal funds under the IDEA, a state must provide a disabled child with special education and related services "in conformity with the [child's] individualized education program," or IEP.  Endrew F., 580 U.S. at 390–91 (quoting 20 U.S.C. § 1401(9)(D)).

The Supreme Court has said that the IEP is "the centerpiece of the statute's education delivery system for disabled children."  Endrew F., 580 U.S. at 391 (quoting Honig v. Doe, 484

U.S. 305, 311 (1988)).  The IEP is the vehicle through which special education and related services are "tailored to the unique needs" of a particular child.  Rowley, 458 U.S. at 181.  The IDEA requires that each IEP includes a written statement of the child's present level of academic achievement and functionality, annual goals, a description of how the child's progress toward those goals will be measured, and a description of related services and supplementary aids necessary to effectuate the special education needed.  See 20 U.S.C. § 1414(d).

### 1.    "Child Find" Obligation

Under the IDEA, a state educational agency is charged with overall compliance with the statutory requirements.  20 U.S.C. § 1401(32).  In turn, the agency delegates authority to conduct initial evaluations and reevaluations of a child's eligibility to receive special education to a local educational agency ("LEA"), usually a school district but in this case Lab Charter School, which also receives federal funding for complying with the IDEA.  Id. §§ 1401(19), 1414(a).  As a condition of receiving federal funding, each LEA, at the beginning of each school year, is required to develop and implement an IEP for each child with a disability who resides within the LEA's jurisdiction.  Id. § 1414(d)(2)(A).  The United States Supreme Court has noted:

> The IDEA's "child find" requirement, requires states to "identif[y], locat[e], and evaluat[e]" "[a]ll children with disabilities residing in the State" to ensure that they receive needed special-education services.  §1412(a)(3)(A);  see §1412(a)(10)(A)(ii).  A reading of the Act that left parents without an adequate remedy when a school district unreasonably failed to identify a child with disabilities would not comport with Congress' acknowledgment of the paramount importance of properly identifying each child eligible for services.

Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 245 (2009).

As an initial matter, LEAs must conduct an evaluation to determine whether a child qualifies under the IDEA for special education and related services.  Id. § 1414(a)(1)(A).

Generally, an LEA must conduct its initial evaluation "within 60 days of receiving parental consent for the evaluation." Id. § 1414(a)(1)(C)(i)(I). Under the IDEA, a child with a disability is a child

> (i) with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this title as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and

> (ii) who, by reason thereof, needs special education and related services.

Id. § 1401(3)(A)(i)-(ii). A team, including qualified professionals and the parent, must conduct the evaluation to determine the educational needs of the child. 20 U.S.C. § 1414(b)(4); § 1414(a)(C)(II). The results of these evaluations form the basis for an IEP, which outlines the student's educational goals and how they can be met. 20 U.S.C. §1414(d). Additionally, a child with a disability must be educated in the "least restrictive environment." 20 U.S.C. § 1412(5)(A).[29]

### 2.  Substantive Versus Procedural Violations

An IEP meets the IDEA's substantive requirements for a FAPE when the substantive content of the IEP is "reasonably calculated to enable a child to make progress appropriate in light

---

[29]  20 U.S.C. § 1412(5)(A) provides:

> (5) Least restrictive environment

> (A) In general

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

of the child's circumstances." Endrew F., 580 U.S. at 399.[30]  Procedural violations, on the other

hand, arise when an LEA fails to comply with the IDEA's process requirements, such as failing to

timely identify a child's disability, to properly convene an IEP team, or to provide parents with

required information.[31]  See e.g., Rowley 458 U.S. at 206 (identifying the "full participation of

concerned parties throughout the development of the IEP" as a procedural requirement).  A

provision of the Act requires:

> written prior notice to the parents of the child, in accordance with subsection (c)(1),
> whenever the local educational agency--
>> (A) proposes to initiate or change; or
>> (B) refuses to initiate or change,
> the identification, evaluation, or educational placement of the child, or the provision
> of a free appropriate public education to the child.

20 U.S.C.A. § 1415.

While the IDEA's procedural protections are detailed in the statute, its substantive

guarantees have evolved through the courts.  In general, "[t]o meet its substantive obligation under

the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress

appropriate in light of the child's circumstances."  Endrew F., 580 U.S. at 399.  And progress is

the touchstone, because "the essential function of an IEP is to set out a plan for pursuing academic

and functional advancement."  Id.  Any other yardstick "would do little to remedy the pervasive

and tragic academic stagnation" that prompted the passage of the IDEA in the first place.

Brandywine Heights Area Sch. Dist. v. B.M. by & through B.M., 248 F. Supp. 3d 618, 632 (E.D.

Pa. 2017) (quoting Endrew F., 580 U.S. at 400).

---

[30]  See also The Rights of Students with Disabilities Under the IDEA, Section 504, and the ADA,
https://www.congress.gov/crs-product/R48068 (last visited September 10, 2025).

[31]  See The Rights of Students with Disabilities Under the IDEA, Section 504, and the ADA,
https://www.congress.gov/crs-product/R48068 (last visited September 10, 2025).

For example, the Third Circuit has recognized that an LEA's failure to respond to bullying could be a denial of a FAPE.  Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S., 381 F.3d 194, 199 (3d Cir. 2004) (finding a district court's ruling that a hearing officer's decision that a school denied a student a FAPE clearly erroneous because bullying persisted and the parent claimed FAPE should be "sufficiently free from the threat of harassment.").  Similarly, in Lauren P. v. Wissahickon Sch. Dist., a defendant's failure to address a child's behavioral problems in a systematic and consistent way denied her a FAPE.  310 Fed. App'x 552, 554-55 (3d Cir. 2009).  And in Penn Trafford Sch. Dist. V. C.F., a failure to "provide a behavior management plan" was found to violate the IDEA.  No. 04-1395, 2006 WL 840334, at *8 (W.D. Pa. Mar 28, 2006).

Furthermore, the Third Circuit has noted that:

> . . . failure to comply with the procedural requirements of the Act will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents. See D.S. v. Bayonne Bd. of Education, No. 08–4730, 602 F.3d 553, 564– 67 (3d Cir. 2010) ("A procedural violation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits.") . . . Under the implementing regulations, substantive harm occurs only if the preponderance of the evidence indicates that the procedural inadequacies (i) [i]mpeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of the educational benefit. 34 C.F.R. § 300.513(a)(2).

C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 66–67 (3d Cir. 2010) (some citations omitted).

Generally, hearing officers may only make decisions on substantive grounds.  See id. § 1415(f)(3)(E)(i).  However:

> In matters alleging a procedural violation [of the IDEA], a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies—
>
> (i) Impeded the child's right to a free appropriate public education;

(ii) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or

(iii) caused a deprivation of educational benefits.

Id. § 1415(f)(3)(E)(ii)(I)–(III).

### 3.    Parental Participation Is Paramount

Among other requirements, the IDEA's implementing regulations require that "Parents of a child with a disability must be afforded an opportunity to participate in meetings with respect to: the identification, evaluation, and educational placement of the child; and the provision of a FAPE to the child." 34 CFR §300.501(b). The LEA also "must provide notice . . . to ensure that parents of children with disabilities have the opportunity to participate in [these] meetings . . . ." Id.

### 4.    Appropriate Relief

The primary purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education [FAPE] that emphasizes special education and related services designed to meet their unique needs . . . ." 20 U.S.C. § 1400(d)(1). Monetary relief for an aggrieved party is not listed under the other purposes of the Act.[32] The United States Supreme Court, however, has established that a party may seek restitution under the IDEA for expenses that "it should have paid all along and would have borne in the first instance had it

---

[32] The Third Circuit has noted that "the language and structure [of the IDEA] make plain that Congress intended to ensure that disabled children receive a FAPE under appropriate circumstances, not to create a mechanism for compensating disabled children and their families for their pain and suffering where a FAPE is not provided." Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd of Educ., 587 F.3d 176, 186 (3d Cir. 2009). However, the court also noted that "by its plain terms, the IDEA does not limit the type of relief a court may order, so long as that relief is 'appropriate.'" Id. at 184; 20 U.S.C. § 1415(i)(2)(C)(iii).

developed a proper IEP."[33]  Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.,

471 U.S. 359, 371 (1985).  And the Third Circuit has held:

> The relief granted by courts under section 1415(i)(2)(C)(iii) is primarily
> compensatory education. Compensatory education, however, is not defined within
> the IDEA and is a judicially created remedy. It is intended as "a remedy to
> compensate [the student] for rights the [LEA] already denied . . . because the [LEA]
> violated [the] statutory rights while [the student] was still entitled to them."

Ferren C. v. Sch. Dist. of Phila., 612 F.3d 712, 717 (3d Cir. 2010) (quoting Lester H. by Octavia

P. v. Gilhool, 916 F.2d 865, 872 (3d Cir. 1990)); see also G.L. v. Ligonier Valley Sch. Dist. Auth.,

802 F.3d 601, 608 (3d Cir. 2015) (holding that if liability is proven for denial of a FAPE at a due

process hearing, parents of a child identified as having special education needs may seek

compensatory education for a period equal to the period of deprivation).

Courts have developed two (2) ways to calculate the scope of compensatory education:  (1)

the "make whole" approach, which the parties agree is not supported by the record here,[34] and (2)

the "hour-for-hour" theory.  The Third Circuit has explained the "hour-for-hour" theory as follows:

> [An LEA] that knows or should know that a child has an inappropriate [IEP] or is
> not receiving more than a de minimis educational benefit must correct the situation
> . . . [I]f it fails to do so, a disabled child is entitled to compensatory education for a
> period equal to the period of deprivation, but excluding the time reasonably
> required for the school district to rectify the problem.

M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist., 81 F.3d 389, 397 (3d Cir.1996).  Courts must therefore

"evaluate the specific type of relief that is appropriate to ensure that a student is fully compensated

---

[33]  Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass addressed the IDEA's
predecessor, The Education of the Handicapped Act, which is in all material respects identical
to the IDEA.  Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd of Educ., 587 F.3d 176,
184 n. 12 (3d Cir. 2009).

[34]  The case that established the "make-whole" approach is G.L. v. Ligonier Valley Sch. Dist.
Auth., 802 F.3d 601, 625 (3d Cir. 2015).

for [an LEA's] past violations of his or her rights under the IDEA and develop an appropriate equitable award." Ferren, 612 F.3d at 720. And the Third Circuit has affirmed that a school's "failure to develop and implement an IEP [is] a per se denial of a FAPE, justifying an award of compensatory education." Lab'y Charter Sch. v. M.R.S. by & through Smith, No. 23-2473, 2024 WL 3518306, at *2 (3d Cir. July 24, 2024).

### B.    Independent Hearing Officer Charles W. Jelley's Final Decision and Order

On March 15, 2024, the Hearing Officer ruled in Parent's favor, issuing this Final Order:

1. The Parent's IDEA claim that the Lab Charter denied the Student a FAPE during the 2022-2023 and 2023-2024 school year is Granted.

2. The Parent's claim for compensatory education is Denied.

3. The Parent's claim for a prospective placement is Denied.

4. Lab Charter is directed to fund an independent: 1. Speech and Language, 2. Occupational Therapy, 3. Assistive Technology, and 4. a Functional Behavioral Assessment. The Parent is free to select the evaluator(s). All evaluations must be completed within the time limits described above.

5. Lab Charter is directed to pay the actual cost of each evaluation within 30 days of billing. Lab Charter is next directed to pay the actual cost of the Student's transportation to and from each evaluation. Each independent evaluator's engagement ends after the Lab Charter and the Parent jointly consider each evaluation, Lab Charter updates the reevaluation report, and Lab Charter provides prior written notice of any action or refusal.

6. Lab Charter's affirmative defense that they complied with the IDEA at all times relevant is Denied.

7. All other claims, demands, and affirmative defenses relating to this dispute are exhausted and otherwise dismissed with prejudice.

(Doc. No. 26-3 at 22–23.)

To reach these conclusions, the Hearing Officer made the following findings of fact, which this Court takes as prima facie correct:[35]

> 7. . . . Based on the single BASC-3 score, the evaluator concluded that the Student met the eligibility criteria for the primary IDEA diagnosis of a Student with an Emotional Disturbance and a secondary diagnosis of Other Health Impairment (OHI) . . .The report does not factor in or discuss the other known disabilities.

> 8. On January 6, 2023, the parties participated in a virtual Individualized Education Program (IEP) meeting. At the meeting, Lab Charter staff prepared a "DRAFT IEP." The "DRAFT IEP" included Reading Comprehension, Counseling, Attention to Task, and Behavior goals. The behavior goal targeted completing assignments. . . . Although the box was checked, indicating the need for a positive behavior support plan and a functional behavioral assessment, the IEP did not include either. The IEP also omitted specially designed instruction targeting the Emotional Disturbance disability. The IEP also omitted ADHD-related executive functioning, organizational, and concentration deficits mentioned in the BASC-3.
> ***

> 10. The present levels [in the IEP] do not include baseline information for fighting or elopement. The academic and behavioral goal statements are not linked to the present levels of educational performance. The goal statements are vague, overly broad, and not individualized.

> 11. . . . The specially designed instruction statements are not individualized or tailored to the Student's emotional, behavioral, academic, or social disability related needs or circumstances.

> 12. . . . The IEP omitted behavioral supports, goals, and ambitious related services.

> ***

> 14. Although the Mother disagreed with the Lab Charter school evaluation and IEP, Lab Charter did not offer or provide the Mother a copy of the procedural safeguards, a Notice of Recommended Education Placement (NOREP), or prior written notice explaining Lab Charter's proposed "action(s)" or refusal to act.
> ***

> 17. On January 12, 2023, Lab Charter scheduled a Family Intervention Meeting. The staff reviewed two behavioral incidents from January 11, 2023, during the Intervention Meeting. The first incident was a disruption in a regular education

---

[35] See Q.T. on behalf of H.P.-B. v. Pottsgrove Sch. Dist., 70 F.4th 663, 666 (3d Cir. 2023).

classroom, and the other was an altercation that caused a head injury to another student. After reviewing the incidents, Lab Charter staff agreed to take the following action steps: 1. the Student could ask for a break when frustrated, or 2. the Student could go to the teacher and ask for an administrator and await help. The "Intervention Meeting" changes are not found in a subsequent updated "DRAFT IEP." Lab Charter did not progress, monitor, or report data about each intervention to the Mother. Lab Charter did not issue prior written notice or a NOREP after the Intervention Meeting.

\*\*\*

28. The Student's Lab Charter school records do not include IEP-specific progress monitoring data. The Mother reports that although she received quarterly report cards, the Lab Charter did not provide quarterly IEP progress reports.

\*\*\*

42. The November 2023 "DRAFT IEP" included goal statements for written expression, counseling, behavior, listening comprehension, and three for math. The goal statements lack baseline data or an objective description of the Student's present levels in math calculation, math facts, written expression, and listening comprehension levels. The behavior goal focused on completing assignments, and the counseling goal targeted self-regulation. Although the behavior and counseling goals are carryovers from the January 2023 "DRAFT IEP," the November goal statements omitted baseline measures.

43. Although the box indicating the need for a positive behavior support plan and a functional behavioral assessment was rechecked, the [second] "DRAFT IEP" failed to include either.

\*\*\*

45. The November 2023 "DRAFT IEP" changed the Student's Level of Support from Itinerant Learning Support to Supplemental Autistic and Learning Support. Yet when Lab Charter offered Autistic Support, Lab Charter did not operate an Autistic Support class at the Student's school.

46. Although the Third-grade report card states that the Student earned passing grades in regular education reading, math, and science, the November 4th grade - IEP placed the Student in Learning Support for reading, math, and science. No explanation for the change was provided. (S-3; P-9; NT pp.450- 459).

47. In February 2024, after hitting another staffer, the Student was restrained in a face-down position by an aide and another staff person. After the restraint episode, contrary to Chapter 711 regulations, the Charter did not hold an IEP meeting to discuss the restraint.

(Id. at 4–11 (citations omitted).)  In addition, concerning credibility, the Hearing Officer found:

. . . I found the Mother open and thoughtful. I also found that the Mother expressed heartfelt and genuine concerns for the Student's safety. The Mother took ownership of her misstatements, inactions, and actions. The Mother was otherwise credible in describing the sequence of events leading up to the filing of the Complaint.

On the other hand, the testimony of Lab Charter staff was choppy, inconsistent, and sometimes incomplete. For example, the Lab Charter witnesses could not explain why they implemented the IEP without consent or prior notice. Although all agreed that fighting and walking out of class interfered with learning, no one cogently explained why Lab Charter never completed and shared the functional behavioral assessment. Likewise, no one ever explained the lack of a positive behavior support plan. These omissions, and others, affected the persuasive weight of the staff's testimony.

(Id. at 12.)

Furthermore, the Hearing Officer made the following legal determinations, which the Court reviews de novo:[36]

> THE DECEMBER 202[2] EVALUATION[37]: The December 202[2] evaluation report is incomplete, inadequate, and otherwise inappropriate. The Charter school's initial evaluation of the Student failed to include a variety of assessments of potential, ability, behavior, and achievement. Absent measures of ability and achievement, the team cannot determine the Student's potential; absent measures of potential, the team cannot set ambitious goals. . . . Lab Charter violated IDEA assessment rules when they used a single measure—the BASC-3—to determine eligibility and the need for specially designed instruction. The record is preponderant that the initial evaluation also lacks executive functioning, concentration, and overall behavioral/mood measures associated with either ADHD or Emotional Disturbance. Finally, absent a variety of assessments, the December 2023 evaluation team failed to consider other qualifying disabilities like Autism . . . . Accordingly, I now find that Lab Charter failed to fully evaluate the Student's educational needs in all areas of expected disabilities. I further find that the evaluation substantially interfered with the Parent's participation and the Student's FAPE rights.
>
> THE INITIAL JANUARY 202[3] IEP IS FLAWED Absent a comprehensive evaluation in all areas of suspected disability, Lab Charter cannot offer a FAPE.

---

[36] M.D. v. Colonial Sch. Dist., 539 F. Supp. 3d 380, 388 (E.D. Pa. 2021) ("Any legal determinations by the administrative decisionmaker are reviewed de novo.").

[37] This is taken verbatim from the Hearing Officer's Decision and Order.  It appears that there were typos in the dates of the initial evaluation and IEPs, so the actual year is in brackets.

The January 2023 IEP fails to include adequate present levels of educational performance with descriptive baseline measures. The goal statements are vague and unrelated to the Student's educational, emotional, or behavioral needs. The Student needed a positive behavior support program, yet the resources were omitted. Student needed Emotional Support, yet the IEP offered academic Learning Support. . . . The specially designed instruction does not address the Student's fighting or elopement behaviors. Finally, although Lab Charter staff checked the box, agreeing to complete a functional behavioral assessment, that too never happened. . . I now find that this combination of IEP and evaluation defects caused a substantive denial of a FAPE.

THE LAB CHARTER IMPLEMENTED THE IEP WITHOUT CONSENT . . . The record is preponderant that Lab Charter failed to obtain parental consent and also failed to provide prior written notice or issue a NOREP. Lab Charter staff knew in February 2023 that the Parent disagreed with the evaluation and IEP when she asked, and Lab Charter funded the IEE. These fundamental IEP and notice errors substantially interfered with the Student's FAPE rights and the Parent's right to participate in the IEP process. Therefore, I now find that these twin standalone violations denied the Student a FAPE.

\*\*\*

[And then] rather than reviewing the IEE report, Lab Charter, without prior written notice, accepted the evaluator's conclusions that the Student was a person with Autism. Then, without Parental participation, Lab Charter drafted and again implemented the November "DRAFT IEP" without Parental consent. . . . Accordingly, I now conclude that these new violations denied the Student a FAPE and substantially interfered with the Parent's procedural rights.

\*\*\*

THE NOVEMBER 2023 IEP IS FUNDAMENTALLY FLAWED . . . As the Parties never met and the Parent never consented to the program or placement, I now find by operation of law that the November 2023 "DRAFT IEP" is not a good faith offer of a FAPE.

THE NOVEMBER IEP IS INADEQUATE AND INSUFFICIENT While the November 2023 "DRAFT IEP" included multiple goal statements, the IEP did not include a positive behavior support plan [PBSP] or a functional behavior assessment [FBA]. The persistent failure to complete the functional behavior assessment and develop a positive behavior support plan for this Student is a substantive violation. Absent a positive support plan, the Student will never have the chance to learn self-regulation and coping skills. The present levels of educational performance are also flawed. The present levels include a multi-column table of test scores that require the Parents to have the test manual and a measurement background to interpret their meaning. Below the table of achievement test scores the IEP includes a caveat that the Student's scores "were

not an accurate measure of ability." When these two facts are combined, I now conclude that without the test manual and "accurate measures of ability," the present levels are not otherwise helpful or measurable. Even assuming the present levels are descriptive, I now find the goal statements overly broad, vague, and unresponsive to the Student's needs or circumstances. . .

(Id. at 15–19 (citations omitted).)

Thus, the Hearing Officer found substantive and procedural violations of the IDEA by Lab Charter.  (See generally Doc. No. 26-3.)  Therefore, because Lab Charter committed substantive violations of the IDEA, a showing of "substantive harm to the child or his parents" is not needed, and there has been a per se denial of a FAPE, justifying an award of compensatory education." See C.H., 606 F.3d at 66–67; see also Lab'y Charter Sch. v. M.R.S., 2024 WL 3518306, at *2.

Regarding relief, the Hearing Officer made the following legal determination, which the Court also reviews de novo:[38]

APPROPRIATE RELIEF: . . . In her opening statement, Parent's counsel grounded the request for compensatory education on the "make whole" theory. In her closing brief, the Parent did not muster, and the record does not include any facts that support "make whole" relief. Next, Parent's counsel did not argue the hour-for-hour approach in her closing statement or on the record. Absent facts supporting either theory, I now conclude that the Parent did not meet her burden of proof in establishing an entitlement to compensatory education relief. Accordingly, the Parent's compensatory education claim under either theory is denied.

(Doc. No. 26-3 at 21 (citations omitted).)

### C.   Hearing Officer's Decision That I.W.M. Was Denied a FAPE Is Supported by the Record and Will Be Affirmed

#### 1.   Hearing Officer Was Correct That I.W.F. Was Denied a FAPE

Because the Administrative Record supports the Hearing Officer's factual findings concerning Lab Charter's substantive violations of the IDEA, the ruling that a FAPE was denied

---

[38]   See M.D., 539 F. Supp. 3d at 388.

in this case will be upheld.  This Court, therefore, need not analyze whether or to what extent Lab

Charter's IDEA violations caused substantial harm to I.W.M. or Parent because, as noted earlier,

substantive violations constitute a per se violation of the IDEA.  C.H., 606 F.3d at 66–67.

Procedural violations also abound here.  The procedural violations are discussed next, followed by

the substantive violations.

<strong>a.    Procedural Violations of the IDEA</strong>

A review of the Administrative Record also confirms that Lab Charter violated procedural

requirements of the IDEA.  The Hearing Officer found, and the Administrative Record confirms,

procedural errors in finding that Lab Charter "failed to fully evaluate the Student's educational

needs in all areas of expected disabilities substantially interfer[ing] with the Parent's participation

and the Student's FAPE rights."  Nor has there been any convincing argument challenging the

Hearing Officer's finding that "notice errors substantially interfered with the Student's FAPE

rights and the Parent's right to participate in the IEP process."  Upon his assessment of the

credibility of the witnesses at the Hearing, the Hearing Officer believed Parent's version of the

disputed facts, including that she did not get the notice required by the IDEA, which would have

provided written notice explaining Lab Charter's proposed actions or omissions.  (See Doc. No.

26-3 at 12.)  Accepting these factual findings as prima facie true, there is nothing in the record to

refute them.  Thus, the Court will affirm that Lab Charter committed procedural violations of the

IDEA.

Clearly, the IDEA's implementing regulations as outlined supra demonstrate the

importance of the IDEA's procedural requirements.  But they also suggest that meetings with the

IEP team, including the parent, should be held when a child's behavioral problems lead to a

situation that endangers the child's own safety.  Here, Parent provides a pertinent example by

35

highlighting an incident that occurred in February 2024, when Lab Charter restrained I.W.M. in a face-down position after he hit another staff member.  (Doc. No. 45-1 at 13.)  And the Hearing Officer rightfully found that after "the Student was restrained in a face-down position by an aide and another staff person, the Charter did not hold an IEP meeting to discuss the restraint in violation of 22 PA. CODE § 711.46."  (Doc. No. 26-3 at 11.)  Not only did Lab Charter fail to hold a meeting about the incident, but the whole incident may have been avoided if Lab Charter had instituted a less restrictive measure, such as providing I.W.M. with a behavior plan (FBA and PBSP).  (See Doc. No. 45-1 at 13.)

### b.    Substantive Violations of the IDEA

#### i.    Lab Charter's Evaluation and Draft IEPs Were Insufficient

Both draft IEPs by Lab Charter fell short of what was required by the IDEA under the circumstances.  The record reflects that the first draft IEP relied on the single BASC-3 score to identify the student's disabilities, failing to discuss some of his most significant known diagnoses. (Doc. No. 26-3 at 4.)  "While the law does not require historical baselines, it does require baselines relating to the 'child's present levels of academic achievement and functional performance.'"  R.B. v. Downingtown Area Sch. Dist., 509 F. Supp. 3d 339, 345 (E.D. Pa. 2020); see 20 U.S.C. § 1414(d)(1)(A)(i)(I).  Here, as held by the Hearing Examiner, the second draft IEP should have added baseline data taken from his performance up until the time it was issued.  (Doc. No. 26-3 at 5.)  Notably, the Hearing Officer correctly observed that the draft IEPs are generic and "not individualized or tailored to the Student's emotional, behavioral, academic, or social disability-related needs or circumstances."  (Id.)  Because a review of the draft IEPs does not glean anything different, the Court will affirm the Hearing Offer's finding that both IEPs drafted by Lab Charter for I.W.M. fell short of the IDEA's requirements.

###### ii.        Lab Charter Failed to Provide an FBA or a PBSP

In addition, under the circumstances here, a Functional Behavioral Assessment ("FBA") and a positive behavior support plan ("PBSP") were required for I.W.M., and Lab Charter's failure to produce them amounts to a substantive violation of the IDEA and therefore a denial of a FAPE. Courts in this district have found that FBAs are required by the IDEA where a student "has been identified with a disability and has an IEP in place, yet still displays behavioral problems." Coleman v. Pottstown Sch. Dist., 983 F. Supp. 2d 543, 565 (E.D. Pa. 2013), aff'd in part, 581 F. App'x 141 (3d Cir. 2014) (quoting D.K. v. Abington Sch. Dist., No. 08-4914, 2010 WL 1223596, at *9 (E.D. Pa., Mar. 25, 2010), aff'd 696 F.3d 233 (3d Cir. 2012)); see also Jalen Z. v. Sch. Dist. of Phila., 104 F. Supp. 3d 660, 669–70 (E.D. Pa. 2015) (repeating the above and adding, "When designing an IEP for a behaviorally challenged student, school districts must 'consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior.'") (quoting 34 C.F.R. § 300.324(a)(2)).  In Pennsylvania, "[PBSPs] shall be developed by the IEP team, be based on a[n] [FBA], and become part of the individual eligible young child's or student's IEP.  These plans must include methods that utilize positive reinforcement and other positive techniques to shape a student's or eligible young child's behavior, ranging from the use of positive verbal statements as a reward for good behavior to specific tangible rewards."  22 PA. CODE § 14.133(b).

Here, although I.W.M. required an FBA and a PBSP, as evidenced by the checked box on both draft versions of the IEP, neither were completed, utilized or distributed to Parent.  (Doc. No. 26-3 at 5.)  Most importantly, under the law, the FBA and PBSP were required here because I.W.M. was (1) identified with a disability, (2) had an IEP in place, yet (3) still displayed behavioral problems, as evidenced by the escalation in his fighting and elopements.  See Coleman, 983 F.

Supp. 2d at 565.  Therefore, the Court will affirm the Hearing Officer's finding that by failing to update, modify or change the IEP goal statements or to complete an FBA and PBSP, Lab Charter denied I.W.M. FAPE, a substantive violation of the IDEA.  (Doc. No. 26-3 at 7.)

### iii.    I.W.M. Did Not Make Meaningful Progress

While I.W.M.'s report card shows satisfactory academic performance at Lab Charter, evidence supports that he did not make meaningful overall progress during his enrollment there. "[T]he IDEA's guarantee of a FAPE promises students only the opportunity to make meaningful progress, not with a perfect or ideal education."  Coleman, 983 F. Supp. 2d at 575–76.  And in some cases, decent grades have been enough to satisfy meaningful progress.  See, e.g., Falzett v. Pocono Mtn. Sch. Dist., 152 F. App'x. 117, 120 (3d Cir. 2005) (affirming that a homebound student who had earned uninflated straight A's had received meaningful educational benefit); Jaffess v. Council Rock Sch. Dist., No. 06-0143, 2006 WL 3097939, at *7 (E.D. Pa. Oct. 26, 2006) (finding that "even assuming [a student with decent report card grades] suffers some level of learning disability, the evidence fails to establish that such disability interferes with [the student's] ability to benefit meaningfully from an educational program without [specially designed instruction].")

Here, however, the record demonstrates that Lab Charter's "safety plan" did not meaningfully benefit him in other important areas like social development, independence and his ability to behave.  One page in the safety plan shows that Lab Charter acknowledged I.W.M. was "experiencing a lack of peer interactions," and that his "[b]ehaviors of concern include '[e]loping and not responding to redirection.'"  (Doc. No. 47-9 at 64.)  The page also outlines how teachers should respond if I.W.M. started exhibiting that behavior, such as "staff will use walkie to alert Restorative Team" and that "[when the student] is in crisis or unable to remain in the learning

38

setting . . . the 'cool down room' [and/or] counselor [should be] available to I.W.M." (Id.) And the document notes "Strategies That Work:  Provide redirection in a calm voice.  Provide opportunities for [I.W.M.] to tell his side of the story when in conflict . . . [and I.W.M.] prefers the cooldown room with the big Joe box and a room with access to [Y]ou[T]ube." (Id.)  However, this proposed remedy is not a substitute for meeting the requirements of the IDEA and the case law interpreting it:  an adequate IEP, meaningful progress, and here, an FBA and a PSBP.

Because I.W.M.'s IEP lacked behavioral goals with any baseline data, his teachers were unable to track his progress toward any improvement in that area.  As the Hearing Officer held: "[t]he Student's Lab Charter school records do not include IEP-specific progress monitoring data," so there was, in effect, no way to measure whether I.W.M. was making any progress, meaningful or otherwise.  (Doc. No. 26-3 at 7.)  Lab Charter's contention that, according to I.W.M.'s IEE, "significant progress [was] made with staying in his seat, staying in the room and completing his work," is notable, but it is unclear from the record what the evaluator used to make that determination or whether Lab Charter considered the IEE in its plan for I.W.M since the contents of the IEE were not discussed at the relevant meeting with Parent.  (Doc. No. 45-1 at 11; Doc. No. 56 at 33.)

Finally, the record supports Parent's claim that Lab Charter never adequately addressed Parent's concerns that I.W.M. may have been bullied by his classmates, and that this likely enflamed the student's tendency to elope and fight with fellow students and teachers.  (See Doc. No. 45-1 at 11.)  Lab Charter's argument that Parent "never visited her son's classroom or witnessed any bullying of him" is unavailing.  (Doc. No. 56 at 31.)

####      c.      Lab Charter's Challenges to the Hearing Officer's
        Method of Arriving at a Finding Is Unavailing

Another reason the Court will affirm the Hearing Officer's finding that Lab Charter denied

I.W.M. a FAPE is because Lab Charter's attack on the Hearing Officer's decision does not

overcome this Court's obligation to give "due weight" to the Hearing Officer's factual findings

and accept them as prima facie true.  See Q.T., 70 F.4th at 666; Rowley, 458 U.S. at 206.

Lab Charter's attack on the Hearing Officer's decision begins with this example:

> On the very first substantive page of the Hearing Officers stated findings (page 3), all of which was made in broad paragraph form, the Hearing Officer cites to pages from the record to bolster a finding that the Parent asserted a need for social skill instruction[.] However, no page citations were made to the multipage exhibits noted and the reference pages 170-175 only reference testimony related to later times in the school year and not to the inception of the Students matriculation as referenced by the Hearing Officer in his conclusions.

(Id. at 40.)  This refers to the following Hearing Officer's finding of fact:

> 3. On August 29, 2022, a meeting was held to develop and review an Individual Student Safety Plan. The record indicates that the Student was fighting in school and walking out of class—eloping. The Parent and the staff agreed that the Student needed a regular education behavioral intervention plan. During the Safety Plan meeting, the Mother stated that the Student also needed social skills instruction. (P-1; P-2; S-9; NT pp.170-175).

(Doc. No. 26-3 at 3.)

First, it is unclear why findings should not be in paragraph form, regardless of size.

Second, the citations to the full IEE (P-1, S-9) and the full Evaluation (P-2) paint a picture

of why I.W.M. needed a regular behavioral intervention plan and do not require page citations to

do so.  (See generally Doc. Nos. 47-4, 47-11.)

Finally, the citation to the transcript of the due process hearing testimony refers to school

staff recognizing that during I.W.M.'s first year at Lab Charter, he had at least three (3) eloping

incidents per week.  (Doc. No. 50-3 at 73.)  The testimony then compares that estimate to how

often I.W.M. was eloping during his fourth-grade experience at Lab Charter, which was "at least three or four times for the week." (Id.)  Similarly, one staff member stated that I.W.M. would have "verbal exchanges with peers [indicating conflict] . . . at least once a week" as well as "physical altercations" in both third grade and fourth grade, sometimes as an aggressor and sometimes as a passive participant. (Id.)

This testimony is relevant to whether I.W.M. needed an FBA and a PBSP, which may have included a plan for some kind of social skills instruction.  The fact that the words "social skill instruction" do not appear in that part of the transcript or that the Hearing Officer referenced Parent's request for social skill instruction that does not appear in the cited part of the transcript does not affect the analysis of Lab Charter's denial of a FAPE to I.W.P.  Finding this attack illustrative of the other eleven (11) criticisms Lab Charter made on the Hearing Officer's method of arriving at his conclusion not convincing, the Court will affirm the Hearing Officer's holding that Lab Charter denied I.W.M. a FAPE.

### 2.     This Case Shall Be Remanded to the Hearing Officer to Reconsider or Explain Why the Hour-for-Hour Approach Is Not Appropriate as a Form of Relief

In denying compensatory education, the Hearing Officer stated, "Absent facts supporting either theory, I now conclude that the Parent did not meet her burden of proof in establishing an entitlement to compensatory education relief." (Doc. No. 26-3 at 21.)  The theories the Hearing Officer is referring to are the "make-whole" and "hour-for-hour" theories.  The parties do not dispute that Parent did not meet her burden to provide facts that support the "make whole" theory of compensatory education.  However, the fact that Parent's counsel at the due process hearing did

not argue the "hour-for-hour" approach is not dispositive to deny Parent compensatory education.[39]

For example, in <u>Montgomery Cnty. Intermediate Unit No. 23 v. C.M.</u>, a court in this district affirmed a Hearing Officer's decision recognizing that courts have "reverted to an 'hour-for-hour' method based on a finding that [the student] and his parents failed to present evidence for a 'make whole' calculation." No. CV 17-1523, 2017 WL 4548022, at *9 (E.D. Pa. Oct. 12, 2017).

And it is not unusual for hearing officers to award "hour-by-hour" compensatory education where the "make whole" approach is not supported. For example, one Hearing Officer noted that: "[e]ven cases that express a strong preference for [the "make whole" method] . . . suggest that hour-for-hour is the default when [not enough] evidence is presented." <u>M.F. v. Saucon Valley Sch. Dist.</u>, Nos. 27684-22-23 & 27704-22-23, at *18 (Pa. Spec. Ed. H.O. Dec. Sept. 15, 2022) (Hearing Officer Brian Ford).[40] <u>See also</u> <u>S.J. v. Sch. Dist. of Phila.</u>, No. 25522-21-22, at *19 (Pa. Spec. Ed. H.O. Dec. Feb. 4, 2022) (Hearing Officer Cheryl Cutrona) (same); <u>A.H. v. Woodland Hills Sch. Dist.</u>, No. 30128-24-25, at *34 (Pa. Spec. Ed. H.O. Dec. Mar. 27, 2025) (Hearing Officer Joy Fleming) (adopting quantitative hour-for-hour approach where there was insufficient evidence to support qualitative make-whole relief).

---

[39] While the narrow issue of whether the Hearing Officer considered enough information to deny "hour-for-hour" compensatory education was not initially fully briefed, it was discussed at the hearing held with counsel for the parties on the Cross-Motions for Judgment on the Administrative Record on August 6, 2025. On August 12, 2025, Plaintiff also submitted a letter to supplement the Court's understanding of this issue. (Doc. No. 65.) Because the issue is central to a review of the administrative record in deciding the instant Motions, it will be considered.

[40] This and the subsequent Hearing Officer Decisions are matters of public record and can be accessed at https://odr-pa.org/due-process/hearing-officer-decisions/.

As noted earlier, courts must "evaluate the specific type of relief that is appropriate to ensure that a student is fully compensated for [an LEA's] past violations of his or her rights under the IDEA and develop an appropriate equitable award." Ferren, 612 F.3d at 720. And the Third Circuit has affirmed that a school's "failure to develop and implement an IEP [is] a per se denial of a FAPE, justifying an award of compensatory education." Lab'y Charter Sch. v. M.R.S., 2024 WL 3518306, at *2.

Here, the Hearing Officer has not discussed his reasons for denying "hour-for-hour" compensatory education. He merely states that "[a]bsent facts supporting either theory, I now conclude that the Parent did not meet her burden of proof in establishing an entitlement to compensatory education relief." (Doc. No. 26-3 at 22.) This conclusory statement does not provide this reviewing Court with sufficient reasons why the "hour-for-hour" theory of relief does not apply here. For this reason, this case will be remanded to the Hearing Officer to either reconsider his conclusion in rejecting the "hour-for-hour" approach or explain in more detail why the facts show this form of compensatory education relief is not appropriate in this case.[41]

---

[41] "The Third Circuit has recognized a court's general authority to remand to an administrative hearing officer for further proceedings, particularly for clarification of the record." Evan H., ex rel. Kosta H. v. Unionville-Chadds Ford Sch. Dist., No. 07-4990, 2008 WL 4791634, at *2 (E.D. Pa. Nov. 4, 2008) (citing Carlisle Area Sch. v. Scott P., 62 F.3d 520, 526 (3d Cir.1995).

**3.    Hearing Officer's Order for Lab Charter to Fund IEEs
Shall Be Enforced**

Because the Hearing Officer found sufficient evidence that Lab Charter denied a FAPE to

I.W.M. and Parent, his order for Lab Charter to fund additional IEEs will be enforced.[42]   At the

hearing on the Cross-Motions, Lab Charter took issue with the Hearing Officer ordering sua sponte

funding for four (4) independent evaluations to be selected by the Parent to be completed within

60 days of the Decision.  (See Doc. No. 56 at 6.)  However, as the Third Circuit noted in Chambers

ex rel. Chambers, "by its plain terms, the IDEA does not limit the type of relief a court may order,

so long as that relief is "appropriate."   587 F.3d at 184; 20 U.S.C. § 1415(i)(2)(C)(iii).   Lab

Charter's argument at the hearing on the instant Motions that the Hearing Officer had no authority

to order it to fund more evaluations for I.W.M. or that funding new evaluations is not appropriate

under the circumstances is unavailing.

More convincing is Parent's argument that the Hearing Officer's order for Lab Charter to

fund an FBA to be completed by April 9, 2024 and speech and language, occupational therapy,

and assistive technology assessments to be completed by May 14, 2024 is appropriate here and by

extension will be ordered by this Court.  (See Doc. No. 45-1 at 33.)  This Court can enforce a

---

[42]   Lab Charter's notion that this claim cannot be considered because Parent failed to raise it in
her original complaint (Doc. No. 56 at 7) does not align with Federal Rule of Civil Procedure
15, which provides in part:
    (a) Amendments Before Trial.
    ***
    (2) Other Amendments. In all other cases, a party may amend its pleading only with
    the opposing party's written consent or the court's leave. The court should freely
    give leave when justice so requires.

Here, the Court freely gave Parent leave to amend because justice so required.

hearing officer's order under the IDEA.  20 U.S.C. § 1415(i)(2)(A); see D.E. v. Cent. Dauphin Sch. Dist., 765 F.3d 260, 276-78 (3d Cir. 2014).[43]

Counsel for Parent submitted at the hearing that Parent tried to confirm that Lab Charter would fund the IEEs to no avail, and that no evaluators would move forward with the evaluations without guarantees of payment.  It is an appropriate remedy for the denial of a FAPE that Lab Charter must fund the IEEs within 60 days of the filing of this Opinion and the accompanying Order.

## V.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment on the Administrative Record (Doc. No. 56) will be denied, and Plaintiff's Motion for Judgment on the Administrative Record (Doc. No. 45) will be granted in part.  This case will be remanded to the Pennsylvania Special Education Hearing Officer for a decision consistent with this Opinion.  An appropriate Order follows.

---

[43]  The Third Circuit has also held that a parent can enforce a hearing officer's order under 42 U.S.C. § 1983, and Parent asks for this relief in the alternative in the Amended Complaint. Jeremy H. v. Mount Lebanon Sch. Dist., 95 F.3d 272, 278 (3d Cir. 1996).